Questions Presented and Answers
The specific questions received from the Department are:
1. Must the Department of Revenue increase the coal tax rate pursuant to section 39-29-106(5), C.R.S. (2006), or does that statute violate the prohibitions of Article X, Section 20 ("TABOR"), on tax increases or new tax policies absent voter approval?
2. If the Department must enforce the increases in the coal tax rate, must the rate be adjusted to the 1978 index of producers' prices, or does the Department have discretion to raise the tax by a smaller increment? *Page 2 
Answers:
Section 39-29-106(5), requires a one percent increase or decrease in the coal severance tax rate whenever the index of producers' prices rises or falls by one and one-half percentage points. Because this statute was enacted prior to TABOR's November 4, 1992 effective date, it does not conflict with TABOR, and a vote is not required prior the Department assessing the increased coal severance tax rate as required by statute. The Department's failure to impose the tax since 1993 was erroneous, and it must implement the statute as written.
Furthermore, the Department has no discretion in calculating the current tax rate. The Department must apply the plain language of the statute and calculate the current coal tax rate using the increase or decrease in the index of producers' prices based on the level of that index on January, 1978.
 Background
In 1977, the General Assembly passed House Bill 1076, imposing a severance tax on coal and other commodities. The bill enacted section39-29-106, which levied a tax of sixty cents per ton "upon the severance of all coal in this state as to all such severance occurring on and after January 1, 1978." Colo. Sess. Laws 1977, Ch. 544, § 1 at 1846.
The bill also tied the coal severance tax rate to the wholesale price index and required adjustments to the rate whenever the index changed by three points:
 (5) For every three point change in the index of wholesale prices for all commodities prepared by the bureau of labor statistics of the United States Department of Labor, the tax rate provided in subsection (1) of this section shall be increased or decreased one percent. . . . The executive director shall determine such adjustments to the rate of tax based upon changes in the wholesale price index from the level of such index as of January, 1978, to the level of such index as of the last month of the quarter immediately preceding the quarter for which any taxes are due.
Id. at 1847. *Page 3 
In 1988, subsection (5) was amended to provide that the tax rate be increased or decreased one percent for each one and one-half percent change in the "index of producers' prices for all commodities prepared by the bureau of labor statistics of the United States department of labor," rather than for each three point change in the wholesale price index. Colo. Sess. Laws 1988, Ch. 285, § 2 at 1344. Also in 1988, the base tax rate was temporarily dropped to thirty-six cents per ton, to revert to the original sixty-cent rate on July 1, 1994. Id. In 1994, however, the General Assembly made the lower rate permanent.[1]
Colo. Sess. Laws 1994, Ch. 55, § 3 at 335.
On November 3, 1992, the voters approved TABOR, effective November 4, 1992. Colo. Const. art. X, § 20. Relevant here, TABOR requires advance voter approval for any new tax, tax rate increase, or tax policy change directly causing a net tax revenue gain to any district, occurring after November 4, 1992. Colo. Const. art. X, § 20(4)(a); see Bolt v. ArapahoeCounty School District Number Six, 898 P.2d 525, 540 (Colo. 1995).
From January 1, 1978 to December 1992, the Department adjusted the formula as required by the statute. Immediately following the passage of TABOR, however, the Department's Office of Tax Analysis issued a one-page memorandum dated April 7, 1993, which begins, "The Colorado coal severance tax rates have not been released since late December, 1992, pending the Department of Revenue's resolution of the applicability of [TABOR] to changes in these tax rates." The memorandum goes on to state:
 Beginning with the tax rate for November 1992, no further increases or upward revisions to tax rates will be made. Rates will be adjusted downward should appropriate index of producers' prices declines occur (as in December 1992). Until further notice the severance tax rate on coal for fiscal quarters beginning on or after December 1, 1992 will be 54.0 cents per ton. *Page 4 
The memorandum offers no explanation for the Department's decision to suspend increases on the coal severance tax rate other than to say that the suspension was pending "resolution of the applicability of [TABOR] to changes in these tax rates."
 Discussion
I. Does the variable nature of the coal severance tax formula requirea vote under TABOR before the tax can be adjusted upwards?
It is incontrovertible that TABOR does not affect taxing schemes in place prior the enactment of that amendment in 1992. See Bolt,898 P.2d at 540 (discussing TABOR's effect as applicable only to tax schemes adopted after November 4, 1992); see also Formal Opinion of the Attorney General No. 96-1 (same). The current version of the coal severance tax was enacted in 1988. The variable nature of the tax, however, and its potential for upward adjustments post-Tabor raises the question of whether such adjustments require voter approval.
It is clear from the plain language of section 39-29-107(5) that, absent TABOR, the Department has no discretion whether to calculate and apply the coal severance tax according to the statutory formula. Subsection 107(5) states, "The executive director shall determine such adjustments to the rate of tax. . . ." § 39-29-107(5) (emphasis added);see People v. Manzo, 144 P.3d 551 (Colo. 2006) (use of the word shall in statute creates a mandatory duty). Thus, the Department's role is purely ministerial.
In the Bolt decision, the plaintiffs challenged an additional mill levy imposed by the Arapahoe County Board of Education as violating the vote requirement of TABOR. Bolt, 898 P.2d 525. While the board of education met and imposed the levy prior to TABOR's passage, the board of county commissioners did not meet to give final approval to the levy until after TABOR became effective. The Court determined that the board of education was required to certify a mill levy sufficient to meet the district budget, and that the board of county commissioners had no power to modify the certified levy. Thus, the Court held that because the levy was imposed by the board of education prior to TABOR's passage, the voter approval requirements of TABOR did not apply. Id.,898 P.2d at 539-540. *Page 5 
Likewise, former Colorado Attorney General Gale Norton came to the same conclusion in two formal opinions analyzing similar situations. In Formal Opinion 93-3, the Attorney General was asked whether increases in employment tax rates computed under the Colorado Employment Security Act required voter approval because the tax rate applicable to an individual employee was dependent on a variety of statutory factors and could fluctuate from year to year. The opinion concluded that because the statutory tax rate schedules were in place prior to TABOR's passage, and necessarily contemplated fluctuations in the tax rate, the tax scheme was not a new tax or tax rate increase under TABOR. The opinion found that the rate changes were based on "objectively measured figures that change yearly. Therefore, surcharge taxes paid will fluctuate from year to year, although the method of the computation of the tax willremain constant." AGO 93-3, pp. 2-3 (emphasis in original). Further, the opinion concludes that while a particular employer's "rates and taxes may fluctuate from year to year, . . . this is solely a function of the established criteria set forth in the statute, and not as a result of a change or increase in the tax rate schedule." Id. at 3.
Likewise, in AGO 95-2, the Attorney General was asked whether theautomatic repeal of a tax exemption on sales of precious metal bullion and coins, which occurred post-TABOR, was a tax policy change requiring voter approval. The opinion concluded, consistent with AGO 93-3, that the repeal was not a tax policy change. The Attorney General found:
 Because the present tax structure was enacted in 1990, and . . . was in place before TABOR . . . , the elimination of the exemption which occurs by operation of this scheme is not a tax policy change or other event within the meaning of TABOR's subsection (4). Therefore, imposition of the tax is not a tax policy change requiring voter approval.
AGO 95-2, p. 2. Thus, because the tax change occurred under a "previously set design" and not as a result of a change in tax policy, voter approval was not required. Id. at 3.
Here, the coal tax rate is similar to these taxing schemes in all relevant respects. The coal tax policy had been set prior to TABOR's effective date and requires adjustments to the tax rate according to pre-set, objective, statutory criteria capable of independent verification. The coal severance tax rate is adjusted as a matter of pre-existing law, and the tax policy has not changed since TABOR's passage, other than to make the thirty-six cent base *Page 6 
rate permanent in 1994. Thus, Revenue is obligated to follow the General Assembly's mandatory directive to adjust the rate according to law. This is analogous to the statutory tax credits which automatically expire, thereby increasing the burden on taxpayers that previously took advantage of such credits. See, e.g., § 39-22-519 (tax credit for use of vehicles in transportation of sludge, enacted in 1994 and automatically repealed in 1999), § 39-22-128 (weather related livestock sale credit for period 2002 to 2004 only); § 39-29-121(1.5) (fifty-percent tax credit for contributions to child care facility, enacted in 2000 and automatically repealed in 2010); see also Memorandum from Office of Legislative Legal Services to Representative Vicki Agler, March 27, 1998 (concluding that income tax credits with automatic repeal date do not require vote under TABOR).
This analysis is supported by a memorandum from the Office of Legislative Legal Services, dated January 15, 1996, which offers a general method of determining what a tax policy change is under TABOR. It describes a two-part test, the first step of which is to "determine if any tax law is being changed in a manner that modifies or affects tax policy." The question asks:
 Is a statute relating to the imposition of a pecuniary charge for the purpose of defraying general governmental expenses of the state or of any local government being created, repealed, or amended in a manner that results in a modification of the standards or rules governing the imposition of the charge?
Here, the statutory formula has not been amended, and the fact that the rate fluctuates with the producer's price index does not cause a tax rate increase under TABOR.
Likewise, the fact that the Department has erroneously failed to increase the coal severance tax is irrelevant. In Colorado Department ofRevenue v. Woodmen of the World, 919 P.2d 806 (Colo. 1996), the court held that the Department could reinstate sales taxes for fraternal societies after many years of allowing them an exemption. Responding to an inquiry from Woodmen, the Department stated in a letter dated October 6, 1944 that it was exempt from the payment of sales tax. The Department confirmed this position in a similar letter on June 2, 1978, and in certificates of exemption issued on August 29, 1979, and October 6, 1988. *Page 7 
In 1989, however, the Department determined that the sales tax code did not exempt sales to fraternal benefit societies. Therefore, the Department notified Woodmen that it was no longer entitled to make purchases that are exempt from Colorado sales tax. Woodmen,919 P.2d at 808. Relevant here, the Court held that an agency interpretation that is in conformity with the relevant statutory provisions and "reasonably supported by the agency's reasoning and the record is entitled to deference. This is true even where the agency decision conflicts with earlier agency interpretations. To hold otherwise would precludeagencies from correcting mistakes and would perpetuate a thwarting ofthe legislature's will." Id. at 817 (emphasis added) (internal citations omitted). Although the facts in Woodmen occurred prior to the passage of TABOR, the decision clearly holds that an agency should not continue to misapply a statute once it determines it has made a mistake.
In sum, the current tax rate has been in effect since 1988, and adjustments have never been discretionary with the Department. The applicable rate is fixed by statute with a mandatory directive to adjust the rate according to changes in the index of producers' prices. To require a vote each time the statutory formula requires an upward adjustment would be to render the statute a nullity.
II. Given the Department's refusal to increase the coal severance taxrate since 1993, would implementing section 39-29-107(5) constitute a"tax policy change" under TABOR?
If adjusting the coal tax rate is a "tax policy change resulting in a net revenue gain" under TABOR, voter approval is required. "Tax policy change" is not defined by TABOR, but the plain meaning of the term "tax policy" necessarily implies a tax scheme imposed by some entity with authority to set "policy" in that arena. For example, among the definitions of "policy" provided by Merriam-Webster's Collegiate Dictionary are: "A definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions," and "A high-level overall plan embracing the general goals and acceptable procedures especially of a governmental body." Merriam-Webster's Collegiate Dictionary (11th ed.) 960. With limited exception, only the General Assembly or the voters may set statewide tax policy; the executive branch merely implements that policy. "[A] regulation may only carry into effect the will and policy established by the General Assembly and an administrative body has no power to impose a new tax." Meyer v.Charnes, 705 P.2d 979, 983 (Colo.App. 1985) (emphasis added); seealso Formal Opinion of the Attorney General No. *Page 8 
96-1 ("A change in tax policy occurs when a statutory modification is made to the standards or rules governing the imposition of a specific tax." (emphasis added)); but see Colo. Const. art. XVIII, § 9 (Limited Gaming Amendment, allowing Gaming Commission to implement annual tax); § 12-47.1-601 (establishing gaming tax criteria).
Thus, the Department does not create "tax policy" by following a statute, and the Department does not change tax policy when it properly follows a statutorily required formula that it previously failed to enforce. The fact that the Department erroneously failed to implement the statutory mandate of section 39-29-107(5) since 1993 does not change this conclusion. The Department had no authority or discretion to set tax policy in 1993. Thus, as a matter of law, its 1993 decision to not enforce section 29-39-107(5) cannot be construed as creating a tax policy it has no authority to create; and it therefore cannot be setting a new tax policy today when it implements the coal severance tax as it has always been required to do by law. Moreover, the 1993 memorandum was not intended to be a definitive statement of agency policy. Instead, it was a statement of the Office of Tax Policy (an informal office within the Department) that any increases would be temporarily suspended "pending the Department of Revenue's resolution of the applicability of [TABOR] to changes in these tax rates."
Accordingly, future implementation of section 39-29-106 by the Department would not constitute a "tax policy change" under TABOR.
III. Does the Department have discretion in how it calculates thecoal severance tax rate?
Given that the coal severance tax rate must be adjusted according to the statutory formula and that it is not a TABOR violation to do so, the final question is whether the Department must adjust the formula upwards from the 1978 base rate, or whether it has the discretion to increase the rate by some smaller amount.
By statute, the base tax rate for coal severance is $.36 per ton. The applicable rate is then calculated according the prescribed statutory formula:
 For every full one and one-half percent change in the index of producers' prices for all commodities prepared by the bureau of labor statistics of the United States department of labor, the tax rate provided in subsection *Page 9 
(1) of this section shall be increased or decreased one percent. The executive director shall determine such adjustments to the rate of tax based upon changes in the index of producers' prices from the level of such index as of January, 1978, to the level of such index as of the last month of the quarter immediately preceding the quarter for which any taxes are due.
§ 39-29-106(1) (5), C.R.S. (2006) (emphasis added).
The unambiguous language of the statute indicates that the adjustments are (1) mandatory, and (2) must be based upon the difference in percentage between the January, 1978 index of producers' prices and that rate at the end of the last quarter immediately preceding the quarter for which taxes are due. Because such adjustments have not been made since 1993, it is likely that a proper application of the tax in 2007 will result in a dramatic increase in the tax obligation of coal producers. Nonetheless, proper application of the statutory formula today results in the same tax rate that would exist had the formula been properly applied each year since 1993, and therefore cannot be characterized as retroactive or an attempt to "catch up" to the required rate.
Moreover, there is no legal authority for allowing the Department to deviate from its statutory duty to adjust the tax rate as required by law. Indeed, the caselaw is to the contrary. See, e.g. American BondingCo. of Baltimore v. People, 127 P. 941, 946-947 (Colo. 1912) ("Public policy and public necessity require prompt and efficient action from such officers (ministerial officers), and, when entrusted with the assessment of taxes and the collection and disbursement of revenue, they have no right to refuse to perform ministerial duties prescribed by law because of any apprehension on their part that others may be injuriously affected by it.")
 CONCLUSION
For the reasons indicated above, I conclude that section 39-29-106(5), C.R.S. (2006), does not conflict with TABOR, and therefore voter approval is not required prior to the Department calculating and assessing the coal severance tax as required by law. Going forward, the Department should apply the plain language of the statute and calculate the current coal tax rate *Page 10 
using the increase or decrease in the index of producers' prices based on the level of the index as of January, 1978.
Issued this 6th day of July, 2007
_______________________________
JOHN W. SUTHERS,
Colorado Attorney General
[1] Legislative testimony concerning the 1994 amendment (HB 94-1239) indicates that the amendment was offered in part because of a belief that the automatic repeal of the thirty-six cent base rate would constitute a violation of the recently enacted TABOR amendment. For the same reasons articulated in this Opinion that the Department's imposition of the statutory tax formula is required by section39-29-106, we disagree that the 1994 amendment was necessitated by TABOR.